IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |  |
|---|---|---|
| **CYNTHIA STANSELL,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| v. | ] | 2:18-cv-00762-ACA |
| | ] | |
| **SHEFFIELD GROUP, INC.,** | ] | |
| | ] | |
| **Defendant.** | ] | |

## **MEMORANDUM OPINION AND ORDER**

Before the court is Defendant Sheffield Group, Inc.'s ("Sheffield") motion for summary judgment. (Doc. 28).

Plaintiff Cynthia Stansell worked as an audit assistant at Sheffield for ten years. In 2016, she unexpectedly had to take eight work days of medical leave. An hour and a half after she returned to work, Sheffield terminated her employment. Ms. Stansell alleges that the termination was motivated by her disability and by her request for medical leave, in violation of the Americans with Disabilities Act ("ADA"), as amended by the ADA Amendments Act of 2008 ("Count One"), and the Family and Medical Leave Act ("FMLA") ("Count Two"). Sheffield responds that it fired her because, on the first day of her leave, her manager discovered what he believed to be gross neglect of her work.

Although there are disputes of fact about whether Ms. Stansell was actually behind in her work, she has not presented any evidence creating a genuine dispute of fact about whether Sheffield believed that she had neglected her work, nor has she presented any evidence that Sheffield denied her any of the leave that she requested. Accordingly, the court **GRANTS** Sheffield's motion for summary judgment and **WILL ENTER SUMMARY JUDGMENT** in favor of Sheffield and against Ms. Stansell on all of her claims.

I.   BACKGROUND

On a motion for summary judgment, the court "draw[s] all inferences and review[s] all evidence in the light most favorable to the non-moving party." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted).

Sheffield provides workers' compensation insurance to employers, who become "members" of the Sheffield Fund. (Doc. 29-1 at 18; Doc. 29-29 at 2 ¶ 2). As of 2016, the Sheffield Fund had 9,000 members. (Doc. 29-1 at 18). Every year, Sheffield conducts an audit of all of its members to determine what premium it should charge each member in the coming year. (*Id.*; Doc. 29-15 at 7). The audit requires the members to submit information and documentation about the number of employees and their wages. (Doc. 29-1 at 18).

Sheffield is required to complete the audit by June 30. (Doc. 29-1 at 19; Doc. 29-29 at 2 ¶ 3). To accomplish that goal, in early January the audit department sends out an "audit request letter" to each member of the Fund, asking for the information and documentation that Sheffield needs. (Doc. 29-1 at 18, 22–23; Doc. 29-15 at 18). Members must respond by April 15. (Doc. 29-1 at 19; Doc. 29-15 at 18). If a member does not respond by April 15, the audit department sends a second audit request, with a new deadline in the first week of May. (Doc. 29-15 at 18).

In 2016, the audit department employed one audit assistant—Ms. Stansell. (Doc. 29-1 at 19). Ms. Stansell's job as audit assistant was to review each audit as it came in. (*Id.*). If the audit contained all the information Sheffield needed, Ms. Stansell would place the complete audit on the "audit shelf," so that the auditors knew to pick up the file and begin working on it.[1] (*Id.* at 20–21, 27).

If an audit was incomplete, Ms. Sheffield would send the member, either by letter or by email, what is known as a "tax doc letter," informing them of the

---

[1] In her brief, Ms. Stansell disputes the fact that completed audits were stored on the audit shelf. (*See* Doc. 35 at 5 ¶ 18). Even assuming this is a material fact, Ms. Stansell herself testified that she put complete audits on the shelf. (Doc. 29-1 at 20). Ms. Stansell later executed an affidavit in which she attested that large audits "had to be stacked on [her] desk until the member complied to the request letters or the audit was ready to give to Chris Monroe for review." (Doc. 34-9 at 4 ¶ 17). That statement clearly relates to incomplete audits awaiting further information or documentation from the member, not complete audits that are ready for an auditor's review.

Similarly, Ms. Stansell attests that Mr. Monroe told her "not to put audits on the shelf until all documents were received and included from the members." (Doc. 34-9 at 4 ¶ 19). That testimony indicates only that Mr. Monroe told Ms. Stansell not to put incomplete audits on the audit shelf, which was reserved for complete audits. Accordingly, the fact that Ms. Sheffield was required to place complete audits on the "audit shelf" is not disputed.

additional information or documentation that Sheffield needed. (*Id.* at 20–21). Tax doc letters are not the same as audit requests; audit requests are sent in the beginning of January with an April deadline and, if the member misses the April deadline, in mid-April with an early May deadline. (Doc. 29-15 at 18–19). Tax doc letters should be sent as soon as a member submits an incomplete audit. (*Id.* at 19).

When Ms. Stansell was the audit assistant, the tax doc letter gave the member two or three weeks to respond. (Doc. 29-1 at 21). If the member failed to respond, Ms. Stansell would send a second tax doc letter. (*Id.*). If the member did not respond in full to the second tax doc letter, Ms. Stansell would send a final tax doc letter. (*Id.*).

Ms. Sheffield testified that when she had an incomplete audit waiting for a response from the member, she would place the file on a "tax document letter shelf," unless she had sent the tax doc letter by email. (Doc. 29-1 at 29, 32–33). If she had sent an email, she would print a copy of the email to keep with the incomplete audit, which she would store on her desk. (*Id.* at 33–34). Ms. Stansell submitted two pictures of her desk (docs. 34-10, 34-11), which she testified she had taken at some time in April 2016 (doc. 29-1 at 34, 36–37). The pictures show several large stacks of documents. (Docs. 34-10, 34-11). Ms. Stansell has labeled the pictures to show that several of the stacks are audits waiting to be reviewed for completeness, or incomplete audits awaiting a response to a tax doc letter. (Docs. 34-10, 34-11).

4

Ms. Stansell was supposed to review every audit as it was received to determine whether Sheffield needed to send a tax doc letter. (Doc. 29-1 at 38). Ms. Sheffield testified that sometimes it could take "several days" to review all of the audits and determine whether she needed to send tax doc letters. (*Id.*; *see also id.* at 32).

If the member never responded with all the required information and documentation, Ms. Stansell would give the incomplete file to her supervisor, Chris Monroe. (Doc. 29-1 at 16, 22). Mr. Monroe would have to decide whether to "close out" the member's account (in other words, decline to renew the member's policy with Sheffield) or estimate the premium due based on the information and documentation available. (*Id.* at 22).

From 2006 until 2014, Ms. Stansell had employee performance evaluations in the "very good" or "exceeds expectations" ranges. (Doc. 29-2 at 40–84). Although Ms. Stansell received high marks in the "quantity of work" section of her evaluations from 2007 to 2014, a recurring theme was the need to continue increasing the quantity of completed audits. (*Id.* at 44–45, 49, 54, 56, 59, 63, 67, 73, 76).

In 2015, Ms. Stansell received a "meets expectations" evaluation for her work in the audit department. (*Id.* at 82–84). Her evaluator, Mr. Monroe, noted that "[w]e need to make sure to stay on top of tax doc letters to make sure info is coming in before audit deadline"; "[a]gain, we just need to make sure we do a better job of

staying on members to get info in before deadline"; and "[w]e will need to improve the system going forward to keep track of when info is requested and when a second request is needed." (*Id.* at 83). Mr. Monroe concluded that, "[a]s we talked about a few weeks ago, [w]e will need to have a plan in place to make sure we are requesting tax docs more regularly. This will cut down on the estimated and close outs that are given to me at the end of June." (*Id.* at 84; *see also* Doc. 29-15 at 65–66). Ms. Stansell denies having the conversation Mr. Monroe referenced in the evaluation. (Doc. 34-9 at 3 ¶ 15).

On May 4, 2016—around the final deadline for members to respond to the "audit request" letters—Ms. Stansell called in sick because she had to go to the emergency room for kidney stones. (Doc. 34-9 at 3 ¶¶ 7–8). On May 10, Ms. Stansell had surgery relating to the kidney stones, and she returned to work on May 18. (Doc. 29-1 at 29). She testified that while she was on leave, no one from Sheffield contacted her about taking leave or discussed the FMLA with her. (Doc. 34-9 at 3 ¶¶ 10–11).

Mr. Monroe attested that when Ms. Stansell began her medical leave, he checked her work station and found "multiple stacks of incomplete paperwork on and around [her] desk with no labels, some of which dated back to at least February 2016." (Doc. 29-29 at 3 ¶ 6). As a result, he called in all four of Sheffield's auditors

and instructed them to stop their regular work and begin processing the audits on and around Ms. Stansell's desk. (*Id.* at 3 ¶ 7).

Three of the auditors testified that they found audits dating back to January and February for which it appeared Ms. Stansell had not sent tax doc letters or emails. (Doc. 29-26 at 15; Doc. 29-27 at 13; Doc. 29-28 at 12, 16, 19). The auditors and Mr. Monroe testified that they spent between five and seven working days catching Ms. Stansell's work up, during which time they did not do any of their own work. (Doc. 29-15 at 21; Doc. 29-26 at 12, 22; Doc. 29-27 at 12–13; Doc. 29-28 at 15, 23, 28). Several of them testified that they did not believe one person could have completed all of the work on Ms. Stansell's desk by the June 30 deadline. (Doc. 29-15 at 26; Doc. 29-26 at 18; Doc. 29-28 at 28–29). The audit department sent between 250 and 300 tax doc letters on Ms. Stansell's behalf during her absence. (Doc. 29-15 at 17; Doc. 29-26 at 12).

Ms. Stansell testified that when she left work on May 3, she had completed all of her work and the incomplete audits were labeled and organized in her cubicle. (Doc. 29-1 at 31–32; Doc. 34-9 at 4 ¶ 20). She posits that the incomplete work on her desk may have been audits that Sheffield received after she went on leave, because Sheffield routinely received a large volume of mail right around the May deadline to submit audits. (Doc. 35 at 24; *see* Doc. 34-9 at 4–5 ¶¶ 18, 24; *see also*

7

Doc. 29-28 at 9–11). She testified that she could have completed all of her work by the June 30 deadline. (Doc. 34-9 at 4 ¶ 22).

On May 4 or 5—very shortly after Ms. Stansell went out on leave, and while the rest of the audit department was working on the files found on her desk—Mr. Monroe recommended to the president of Sheffield that the company terminate Ms. Stansell's employment. (Doc. 29-15 at 14; *see* Doc. 29-1 at 23). The president agreed with that recommendation. (Doc. 29-15 at 17; Doc. 34-7 at 15, 18). Before Ms. Stansell returned to work, Mr. Monroe wrote a note for her personnel file setting out the rationale behind the decision to fire her as neglect of her work. (Doc. 29-3 at 3).

Ms. Stansell returned to work on May 18. (Doc. 34-9 at 5 ¶ 23). After an hour and a half, she had a meeting with Mr. Monroe at which he told her that Sheffield no longer required her services and terminated her employment. (Doc. 29-1 at 30).

## II. DISCUSSION

Ms. Stansell asserts that her termination violated the ADA and that it constitutes FMLA interference and retaliation. (*See* Doc. 1 at 6–13; Doc. 35 at 22–28). Because the analysis is the same for the ADA and the FMLA retaliation claims, the court will address those claims together first, and conclude by addressing the FMLA interference claim.

### 1. The ADA and FMLA Retaliation Claims

In Count One, Ms. Stansell asserts that her termination was discrimination based on her disability, in violation of the ADA. (Doc. 1 at 6–9). In Count Two, Ms. Stansell asserts in part that her termination was retaliation for taking FMLA leave. (*Id.* at 10–13).

The ADA prohibits "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

The FMLA permits eligible employees to take a certain amount of leave per year "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). It also prohibits retaliation against an employee for engaging in a practice protected by the FMLA. *Id.* § 2615(a)(1), (a)(2); *see also Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001). To establish an FMLA retaliation claim, an employee must show "that [her] employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *Strickland*, 239 F.3d at 1207.

In the absence of direct evidence, courts analyze claims of discrimination in violation of the ADA and retaliation in violation of the FMLA under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Strickland*, 239 F.3d at 1207 (FMLA retaliation claims); *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1333 (11th Cir. 1999) (ADA discrimination claims). Under that test, the plaintiff must first establish a *prima facie* case of discrimination or retaliation, creating a rebuttable presumption that the employer acted unlawfully. *Strickland*, 239 F.3d at 1207; *Farley*, 197 F.3d at 1336. In this case, the court will assume that Ms. Stansell has established the *prima facie* case.[2]

---

[2] Sheffield argues that Ms. Stansell cannot establish a *prima facie* case of ADA discrimination because it has offered a legitimate, non-discriminatory reason for her termination. (Doc. 30 at 16). The existence of a legitimate, non-discriminatory reason does not affect whether Ms. Stansell can establish a *prima facie* case of discrimination; those are two separate aspects of the *McDonnell Douglas* test.

Sheffield also argues that Ms. Stansell's ADA discrimination claim fails as a matter of law because she cannot establish that she is disabled as defined by 42 U.S.C. § 12102(1)(A). (Doc. 30 at 29–31). Ms. Stansell disputes that argument. (*See* Doc. 35 at 27). Even if the court accepted Sheffield's argument that she is not disabled under § 12102(1), Sheffield has not addressed an alternative definition of disabled under the statute: a plaintiff who the employer regards as disabled. 42 U.S.C. § 12102(1)(C). The court declines to *sua sponte* address whether Ms. Stansell qualifies as a disabled person under every definition of "disabled" provided by the ADA, and will assume that she meets the requirement of establishing that she is disabled for purposes of the ADA.

Finally, Sheffield argues that Ms. Stansell cannot establish a *prima facie* case of ADA discrimination because she never requested an accommodation on account of her alleged disability. (Doc. 30 at 27–29). Ms. Stansell concedes that she never requested an accommodation. (Doc. 35 at 8 ¶ 41). However, Eleventh Circuit caselaw permits a plaintiff to make out a *prima facie* case without showing that she requested an accommodation. *See Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1255–56 (11th Cir. 2007) ("To establish a prima facie case of discrimination under the

Next, the burden shifts to the employer to "articulat[e] a legitimate nondiscriminatory reason for the challenged employment decision." *Farley*, 197 F.3d at 1336. If the employer can satisfy its burden, then the plaintiff must offer evidence that the reason proffered was a pretext for discrimination or retaliation. *Id.*. To establish that a reason was pretextual, the plaintiff must present evidence that "the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007).

Sheffield's articulated legitimate, non-discriminatory reason for Ms. Stansell's termination is that it believed that she had grossly neglected her duties before she went on medical leave, although it discovered that neglect only after she went on leave. (Doc. 30 at 17–24, 37). Even taken in the light most favorable to Ms. Stansell, the evidence establishes that after she called in sick on May 4, Mr. Monroe went by her desk and found what he believed were multiple stacks of incomplete audits for which Ms. Stansell had not sent tax doc letters. (Doc. 29-29 at 3 ¶ 6). As a result, he ordered the entire audit department to stop their work and focus on completing all the paperwork on Ms. Stansell's desk, which took them at

---

ADA, a plaintiff must show: (1) he is disabled; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability.").

least five full working days. (Doc. 29-15 at 21; Doc. 29-26 at 12, 22; Doc. 29-27 at 12–13; Doc. 29-28 at 15, 23, 28; Doc. 29-29 at 3 ¶ 7).

The undisputed evidence that Sheffield believed Ms. Stansell had neglected her work is sufficient to satisfy the employer's burden under the *McDonnell Douglas* test. *See Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002) ("The factual issue to be resolved [at the legitimate, non-discriminatory reason prong of the *McDonnell Douglas* test] is not the wisdom or accuracy of [the employer]'s conclusion that [the plaintiff] was an unsatisfactory employee. [The court is] not interested in whether the conclusion is a correct one, but whether it is an honest one."). Accordingly, the burden shifts back to Ms. Stansell to present evidence creating a genuine dispute of material fact about whether that articulated reason was pretext for discrimination or retaliation.

Ms. Stansell contends that she has presented evidence of pretext because: (1) she was not, in fact, behind on her work and would have been able to complete all of the audit files by Sheffield's deadline; (2) three other employees who "committed performance or policy violations and did not request medical leave were not terminated"; (3) Sheffield attempted to deny her unemployment compensation; and (4) only one and a half hours elapsed between her return to work and her termination. (Doc. 35 at 23–24, 28).

12

"[T]he fact that [Ms. Stansell] thinks more highly of her performance than her employer does is beside the point. The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010). As stated above, the undisputed evidence shows that Mr. Monroe believed Ms. Stansell had neglected her work, and based on that belief he recommended terminating her employment, a recommendation that the decisionmaker adopted. (Doc. 29-15 at 14, 17; Doc. 34-7 at 15, 18). Ms. Stansell has not created a genuine dispute of material fact about the truth of Mr. Monroe and the decisionmaker's belief in her neglect.

Ms. Stansell's argument about the three employees who were disciplined but never requested medical leave appears to be an argument that Ms. Stansell had comparators, which is usually a part of the *prima facie* case. *See Lewis v. City of Union City, Ga.,*, 918 F.3d 1213, 1218 (11th Cir. 2019) (en banc) ("[W]e hold . . . that a meaningful comparator analysis must be conducted at the *prima facie* stage of *McDonnell Douglas*'s burden-shifting framework, and should not be moved to the pretext stage.") (alteration and quotation marks omitted). However, if a plaintiff can establish proper comparators, the court can consider that evidence at the pretext stage as well as the *prima facie* stage. *See Hairston v. Gainesville Sun Pub. Co.*, 9

F.3d 913, 921 (11th Cir. 1993) ("Evidence already introduced to establish the prima facie case may be considered [at the pretext stage].").

In this case, Ms. Stansell's purported comparator evidence does not create a genuine dispute of fact about whether the termination was pretextual because Ms. Stansell has not established how the three comparators she identifies in her brief are "similarly situated [to her] in all material respects." *See Lewis*, 918 F.3d at 1227–28. Even if some other Sheffield employees were disciplined for violations of performance standards of company policies, Sheffield's decision not to terminate them does not show that its decision to terminate Ms. Stansell was pretextual.

With respect to Ms. Stansell's argument about the denial of unemployment compensation, even if true, opposing the payment of unemployment compensation would not establish that Sheffield's reason for terminating her employment was disability discrimination or retaliation for using FMLA leave. That evidence does not even hint at a different (prohibited) motive for her termination.

And finally, the temporal proximity between Ms. Stansell's return to work and her termination cannot alone serve as evidence of pretext sufficient to withstand a motion for summary judgment. *Cf. Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298–99 (11th Cir. 2006) (stating that a two week delay between the employee's request for leave and his termination "is evidence of pretext, though probably insufficient to establish pretext by itself," but holding that the plaintiff had

presented evidence of pretext when considering the close temporal proximity in connection with evidence of the employer's "failure to articulate clearly and consistently the reason for an employee's discharge" and a "deviation from [the employer's] own standard procedures").

Because Ms. Stansell has not created a genuine dispute of material fact about whether Sheffield's articulated reason for her termination was pretext for either discrimination under the ADA or retaliation under the FMLA, the court **GRANTS** Sheffield's motion for summary judgment on those claims.

### 2. The FMLA Interference Claim

As an initial matter, it is not clear that Ms. Stansell's complaint actually asserts a claim of FMLA interference. In her FMLA claim, Ms. Stansell describes the same factual basis as her claim under the ADA and asserts that Sheffield fired her because she took leave. (*See generally* Doc. 1 at 10–12). An FMLA interference claim, however, requires a plaintiff to "demonstrate by a preponderance of the evidence that [she] was entitled to the benefit denied." *Strickland*, 239 F.3d at 1206–07; *see also* 29 U.S.C. § 2615(a)(1). The complaint does not state that Ms. Stansell was denied any benefit under the FMLA; only that Sheffield retaliated against her for taking medical leave. But even assuming that Ms. Stansell's complaint can be read to assert a claim of FMLA interference, Ms. Stansell has not presented any evidence that Sheffield denied her request for leave. To the contrary, the undisputed

evidence is that Sheffield allowed Ms. Stansell to finish her medical leave before it terminated her employment.

In her brief in opposition to summary judgment, Ms. Stansell argues that Sheffield's failure to notify her that she qualified for FMLA was a "per se violation of the FMLA" (doc. 35 at 21), apparently because the lack of notification discouraged her from using FMLA leave on other occasions (*see id.* at 22). Even assuming that lack of notification of coverage under the FMLA constitutes a valid FMLA interference claim—which it does not—Ms. Stansell did not raise that claim in her complaint, and "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004); *see also Chavis v. Clayton Cty. Sch. Dist.*, 300 F.3d 1288, 1291 n.4 (11th Cir. 2002).

Because Ms. Stansell has not presented any evidence creating a dispute of material fact about whether Sheffield interfered with her rights under the FMLA, the court **GRANTS** Sheffield's motion for summary judgment on the claim of FMLA interference.

### III. CONCLUSION

The court **GRANTS** Sheffield's motion for summary judgment and **WILL ENTER SUMMARY JUDGMENT** in favor of Sheffield and against Ms. Stansell

on all of her claims. The court will enter a separate final judgment in accordance with this opinion.

**DONE** and **ORDERED** this February 5, 2020.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE